JOHN JOSEPH, Admr., Defendant in Error, *vs.* THE PEORIA AND PEKIN UNION RAILWAY COMPANY, Plaintiff in Error.

### *Opinion filed December 16, 1914.*

1. NEGLIGENCE—*when question whether the deceased was in the discharge of his duties at time of death is for jury.* In an action against the master for damages for the death of a servant in an accident to which there were no eye-witnesses, if there is evidence tending to show that in the discharge of his duties the deceased was required to get in the position he was at the time of his death it is a question for the jury whether he was in the discharge of his duties at the time, even though there is evidence tending to show the contrary.

2. EVIDENCE—*when it is not reversible error to permit a party to impeach his witness.* Where the plaintiff's witness is asked, on cross-examination, a question which is not proper cross-examination, and is allowed, over objection, to give an answer which is contrary to his testimony on a former trial, it is not reversible error to permit the plaintiff, upon the ground of surprise, to ask the witness, on re-direct examination, if he was not asked a certain question on the former trial and if he did not answer it a certain way, and to prove the question and answer by the court reporter after the witness has stated that he does not remember.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Peoria county; the Hon. LESLIE D. PUTERBAUGH, Judge, presiding.

FRANK T. MILLER, and JOHN M. ELLIOTT, (STEVENS, MILLER & ELLIOTT, of counsel,) for plaintiff in error.

QUINN, QUINN & McGRATH, for defendant in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

The Appellate Court for the Second District affirmed a judgment of the circuit court of Peoria county against the plaintiff in error for $5000 for the death of the defendant in error's intestate, Joseph Gibron, and a writ of *certiorari* has been awarded to bring the record before us for review.

The case has been tried twice and a verdict returned for the same amount each time, the trial court having set aside the first verdict.

The deceased was killed in the railroad yards of the plaintiff in error in Peoria, where he was employed as a coal shoveler in unloading cars of coal at a coal chute. This chute consisted of a hopper of steel or sheet-iron set in the ground, seventeen feet long and sixteen feet wide at the top, which was the surface of the ground, and having its sides sloping to an opening three feet square at the bottom, which was seven feet deep. A track was laid across this hopper and the cars used were dump-bottom cars. They were unloaded, after being placed in position over the chute, by opening the bottom of the car. The coal ran out of the three-foot opening in the bottom of the chute and was then elevated by an endless chain of buckets operated by steam power. The method of unloading was to place the car over the hopper in such a position that the front wheels were just outside the edge of the hopper, leaving the body of the car extending over the hopper. In this

position the front half of the car could be emptied into the hopper by opening the bottom, the shovelers, of whom the deceased was one, shoveling the coal out of the end of the car beyond the movable bottom. The car was then shoved along the track until the rear half of the car was over the hopper, when it would be emptied in the same way. After the front end of the car was unloaded the car would be moved forward by "pinching,"—that is, by the use of crow-bars under the rear wheels. The coal, in running out of the car, would run over the edge of the hopper and against the sides of the rails, so as to come in contact with the flanges of the front wheels and prevent the car being pinched forward. The coal shovelers would have to clean off the coal at the front end of the car before undertaking to move it. This they would do with a shovel or broom, and sometimes large pieces would have to be pushed out by hand.

The deceased had been in the employ of the plaintiff in error about thirty days. On the night of December 24, 1910, with two other coal shovelers, he was unloading a car of coal, and about two o'clock A. M. they had finished unloading the front end, which was the north end. He was a Syrian, about twenty-five years old, had only been in this country six or seven months, and had a very limited knowledge of the English language. The two shovelers working with him were Conzick, a fellow-Syrian, and a colored man, named Walker. The conflict in the evidence begins at the point where the three men had finished unloading the north end of the car. Before the south end could be unloaded it was necessary to move the car north a few feet so as to bring the dump-bottom in that end of the car over the hopper. A man named Crozier was weighmaster for plaintiff in error and had immediate charge of the three coal shovelers. He testified that because of cars standing on the track to the north of the car being unloaded there was not room to push the last mentioned car forward so that the south end of it could be unloaded, and

that he told the shovelers to go to the round-house and he would see if he could get an engine to pull the car down. He testified that after the north end of the car was unloaded "we got the men down on the ground and tried to pinch the car and found we could not do it;" that Conley, the round-house foreman, came along and said the car could not be pinched down because there were too many cars ahead of it and that he would have a switch engine come in and pull the car down. Crozier further testified he told the men he would get a switch engine; that they could go to the round-house and eat lunch, and that he would tell them when the car was set. Conley, on cross-examination, and over the objection of defendant in error, testified he told the three coal shovelers and Crozier he would have a switch engine come and move the car so that it could be unloaded and that they could go to the boiler-house until they were notified the car was ready to be unloaded. Conzick was not a witness at the trial. Walker testified at the first trial but was not present at the second. His testimony at the first trial was read to the jury at the second trial. He testified he was working with the deceased the night he was killed, in the capacity of a coal shoveler, and had been working with him for about three weeks. He testified he and another shoveler got out of the car about twenty minutes before the dead body of Gibron was found and said they were going to the round-house to get lunch; that Gibron got out of the car with them and they left him at the car; that Gibron was sober and in a cheerful mood. This was his testimony when placed upon the witness stand by the defendant in error. Later he was placed on the stand by plaintiff in error as its witness, and on direct examination testified he did not know an engine was coming down until after Gibron was killed; that when the three of them got off the car he thought Gibron was going with him and the other shoveler; that the two of them went to the round-house, where they stayed about

twenty minutes; that the other fellow went out and came running back just as the witness passed out of the round-house door; that he went to the track and saw Gibron under the wheels; that his body was lying across the rail, his head and arms hanging on one side and his legs on the other. On cross-examination he testified they intended, when they came back to the car from the round-house, to pinch the car down to where it could be unloaded. In an affidavit made for a continuance at the second trial because of the absence of Walker, it was alleged that if he were present he would testify to certain things, among them that Conley notified the shovelers he would have an engine come and move the car and that they could go to the round-house and wait until they were called. It was admitted the witness would testify as alleged in the affidavit if present, and the affidavit was read to the jury. The testimony of the same witness given on the former trial, when personally present in court, was read to the jury, and there were such discrepancies and contradictions between that testimony and the statements in the affidavit for a continuance that the jury might well attach little weight to the affidavit.

In addition to the testimony of Walker on the first trial that he knew nothing about a switch engine coming to move the car and that it was the intention of the shovelers after coming back from their lunch in the round-house to pinch the car down to a place where it could be unloaded in the hopper, there are other circumstances entitled to be considered as tending to show either that no such notice was given the shovelers or that it was not understood if it was given. Gibron was unfamiliar with the English language, which fact was known to the plaintiff in error's representatives under whom he worked. What followed immediately after the north end of the car was unloaded indicated either that the deceased was not notified the car would be moved by an engine or that if any such notice was given he did not understand it. He remained at the

car and twenty minutes later was found lying across the east rail, dead, the south wheel of the north truck having passed over his body. There was a conflict in the evidence as to whether, in the discharge of his duties, he was accustomed or required to get in the position in which he was found dead. There was evidence tending to show that he was, and other evidence on behalf of the plaintiff in error tended to show the contrary. The proof abundantly showed that in unloading the coal it would run over between the tracks and against the sides of the rails where the flanges of the wheels ran. This would have to be removed before the car could be moved by pinch bars. It was sometimes removed with a broom or a shovel and sometimes with the hands, which required getting under the car. It is impossible to imagine that Gibron would have placed himself in the position in which he was found, for any other purpose than to remove the coal from the tracks in the discharge of his duty unless he intended to commit suicide, which is negatived by proof that twenty minutes before he was found he was sober and in a cheerful mood. There was also proof that deceased was a sober and industrious man, careful and prudent for his safety.

It is insisted by plaintiff in error Gibron could not have been in the place he was for the purpose of removing the coal from the sides of the rail, because the proof showed this had been done and an attempt made to pinch the car north before the shovelers were told to go to the roundhouse and that an engine would be brought to move the car. It is true, certain witnesses testified to that state of facts, but it is also true that other testimony and circumstances proven tended to discredit that testimony. Upon a consideration of all the evidence we think it was a question to be submitted to the jury whether the deceased, at the time he came to his death, was in the exercise of reasonable care and caution in the discharge of his duties, or whether he was guilty of negligence, and the trial court did not err

in submitting the case to the jury. *Stollery* v. *Cicero and Proviso Street Railway Co.* 243 Ill. 290.

Conley was first placed upon the stand by defendant in error as his witness and asked what his position was with plaintiff in error at the time of Gibron's death, how long Gibron had been employed by plaintiff in error, what time he was killed and what wages he was receiving. He also testified he gave an order for a switch engine to go to the coal chute, and that it ran in on the track that ran over the coal hopper and on which Gibron was killed. On cross-examination counsel for plaintiff in error started to interrogate the witness about whether he notified anyone that the switch engine was coming to pull the car down and whom he so notified. This was objected to by counsel for defendant in error, but the objection was overruled and the witness testified he told the shovelers they could not pinch the car down because of so many cars being on the track ahead of it, and that he would have a switch engine come and move the cars out of the way and spot the car they were unloading over the hopper and would call them when the car was ready. On re-direct examination he was asked if he testified to the same thing on the first trial of the case, and answered he did not then remember what he then said about telling Gibron that he would send an engine in to move the car. This examination was objected to by plaintiff in error on the ground that defendant in error could not impeach his own witness. Counsel for defendant in error stated he was surprised at the testimony of the witness in view of his testimony at the former trial, and the court ruled that upon that basis he might proceed with the examination. The witness was then asked whether at the former trial he had been asked the question, "Had anything been said to these men with reference to moving that car to the north to be unloaded?" and whether he had answered the question, "No, I did not give any orders for it; the man that runs the coal chute gives those orders." The

witness answered that he did not remember, and defendant in error was permitted to prove by the court reporter, over the objection of plaintiff in error, that on the former trial the question had been so asked and so answered. This ruling is complained of as reversible error. The rule is well established that a party cannot impeach a witness voluntarily called by him, except as that may be incidentally done by proving a state of facts different from that sworn to by the witness in question. (*Chicago City Railway Co. v. Gregory,* 221 Ill. 591.) But that rule is not controlling upon the question here presented. It was not competent cross-examination for plaintiff in error to inquire of the witness as to what notice had been given the three coal shovelers that an engine was coming in to move the car, and the objection of defendant in error should have been sustained if the technical rules of evidence were to be observed. If defendant in error's objections had been sustained plaintiff in error could, by leave of the court, then, or later when it came to the introduction of its testimony, have made the witness its witness for the purpose of testifying to the same matters. In either case defendant in error would have had the right to impeach the witness in the manner permitted by the court in this case. Should the fact that plaintiff in error was permitted to examine the witness as a part of the cross-examination of defendant in error's witness instead of making him its own witness deprive defendant in error of the right to prove that he testified to a different state of facts from that testified to on the former trial? We think neither justice, common sense nor even the technical rules of evidence require a reversal of the judgment upon this assignment of error.

The instructions given were in harmony with our view of the law, and finding no reversible error in the record the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*